The following case in the Court of Errors and Appeals, decided on appeal from the decision of the Chancellor before reported in this volume, not having been published in the reports of the Court of Errors and Appeals, is deemed of sufficient importance to be here appended.

POTTER GRIFFITH ET AL.

*vs.*

THE STATE OF DELAWARE.

*In the Court of Errors and Appeals, at the June Term 1848.*

A valid trust can never fail for the want of a trustee.

Wherever may be the legal estate, if the trust is valid it will be protected and enforced in a court of equity.

Devise in trust for the benefit of "such only the poor of Kent County who by timely assistance may be kept from being carried to the Poor House and becoming subjects thereof." *Held* to be a description of the beneficiaries not too uncertain to be carried into effect.

Devise of a fund to trustees for the benefit of the poor of Kent County &c,—"the distribution thereof to be made by agents to be appointed by the Orphans' Court or the Levy Court of Kent County, as might be deemed proper." *Held*, that either the Orphans' Court or the Levy Court were competent to appoint the necessary agents for distribution of the fund; but that were it otherwise, or were both the courts designated to refuse or neglect to make such appointment, the Court of Chancery is competent to supply the required agency.

Where a power of appointment is vested in one of two persons or bodies, either may exercise it; and the one first exercising it does so to the exclusion of the other.

Uncertainty as to the objects of a charitable use is not an objection to its validity. In this respect charitable uses differ from ordinary trusts. If the objects be uncertain, or the particular mode of application fail, the fund may be administered in England either by the Crown as *parens patriæ* or by the Court of Chancery; in this State such a charity will be administered by the Court of Chancery.

The rule of law against perpetuities is not applicable to trusts for charity.

The English Statute of Mortmain of 9 George II is not in force in this State.

The third section of the Statute of this State which prohibits devises of lands to religious societies, except in the mode therein prescribed, does not apply to devises to charitable uses generally.

The jurisdiction of the Court of Chancery to enforce such charitable uses as were void or defective at common law was not derived from the Statute of 43 Elizabeth, but existed prior to and independently of that Statute.

The jurisdiction over charitable uses exercised by the English Court of Chancery is by the constitution and laws of this State vested in its Court of Chancery.

---

This was an appeal from the decree of the chancellor establishing certain trusts of real estate for charity under the will of Benjamin Potter dec'd, in the case reported ante p. 392.

The heirs at law of the testator, being advised that the devise to charity was void, brought their action of ejectment to recover the real estate devised. Thereupon, in order to obtain a judicial decision as to the validity of the trusts, a case stated was agreed upon and filed in the Court of Chancery, wherein the State of Delaware was made a party complainant and the heirs at law defendants, with the same effect as upon an information filed by the Attorney General to restrain the ejectment at law and to establish the trusts of the will.

The devise in controversy, as resulting from the will and codicils of the testator, was of all the residue of his estate, including a large real estate, situated in Kent County, to Potter Griffith, George S. Adkins and Levin H. Adams, (who were also appointed Executors) in trust " to be by them my said executors rented out and the proceeds arising from such rents to be applied to and for the support,

maintenance and education of the poor white citizens of Kent County generally"—the distribution thereof to be made by agents to be appointed by the Orphans' Court or the Levy Court of Kent County, as may be deemed most proper. " I wish it to be clearly understood that no part of my bequest shall be applied to the use or benefit of any person or persons residing within the walls of the Poor House ; but to be distributed amongst such only of the poor who by timely assistance may be kept from being carried to the Poor House and becoming subjects thereof." *

The trustees named in the will declined to accept the trust.

The questions raised by the case stated turned upon the validity of the devise in trust above quoted and the power of the Court of Chancery to establish and execute the same. It was agreed that if the Chancellor should be of opinion that the trusts were valid and such as could be executed in a court of equity, the ejectment at law brought by the defendants should be perpetually restrained and the trusts of the will established ; but that if the Chancellor should be of opinion that the trusts were invalid and such as could not be executed in a court of equity, a decree should be entered accordingly. A right of appeal was reserved to the respective parties.

The Chancellor upon the hearing of the case stated rendered a decree, sustaining the devise in question and perpetually enjoining the heirs at law from prosecuting any claim to the real estate. From this decree an appeal was taken by the heirs at law.

The appeal was argued in the Court of Errors and Appeals at the June Term 1848, before Booth C. J. and Harrington, Milligan and Wootten, Justices.

*D. M. Bates,* for the appellants, the heirs at law.

There are two distinct objections to the validity of this devise to charitable uses. One is its uncertainty ; the other that it seeks to create a perpetuity in real estate.

*First.* And first, as to its *uncertainty.* Two great questions are here involved, viz, (1) whether on general principles, applicable to trusts at large, this devise would be void for uncertainty ? and if so,

* The material parts of the will and codicils are set forth at large *ante p.* 394, *note.*

(2) whether because it is a devise for charity the court will notwithstanding its uncertainty, execute it according to the English doctrine of peculiar favor to charities, as held prior to the Statute of Mortmain, 9 Geo. II ?

I. Is the devise, on principles applicable to trusts at large, void for uncertainty?

No disposition of property can be carried into effect unless it is certain as to the *subject matter* disposed of, the *objects* to take, and the *interests* to be taken. 1 *Jarman on Wills.* 315 &c. 2 *Sto. Eq. Jur.* 979, *a.*

This rule is a necessary result of the want of power in the court to do any thing but execute strictly the intent of the grantor. It is an *unvarying* rule. It applies with as much stringency to dispositions by *will* as by *deed,*—to the creation of *trusts* as to the limitation of *legal estates.*

The present trust is fatally uncertain as to every thing essential except the subject matter of the gift;—but more particularly so as to the *objects to be benefited;* and in regard to these the uncertainty lies in two particulars ;—

·1. The objects are of so vague and indefinite a description that even if there was a power of selection appointed the devise must fail as a trust.

A trust differs from a *power.* The latter may be exercised *ad libitum.* But a trust must be exercised according to the intention of the person creating it, for the benefit of objects described, and subject to the control of the Court. Hence, the description of the objects must be so far definite that the trustee may know precisely whom the testator meant to benefit, that there may be somebody with an interest in the trust sufficiently vested to call on the trustee to perform it ; and that the court may be able to control the trustee and see in whose favor to enforce the trust.

By *definiteness* it is meant that the objects should be of such a known description that it can be determined who they are by *some certain rule* or *standard of proof*, so that it shall not be a mere matter of opinion or judgment. This view is fully illustrated and supported by *Morrice vs. Bishop of Durham*, 9 *Ves. Jr.* 398 ; *Mills vs. Farmer*, 3 *Mer.* 15 ; *Brown vs. Yeale*, 7 *Ves. Jr.* 50 ; 2 *Bac.*

*Abr.* 200,*new ed'n*; *Atty. Gen. vs. Dashiel,* 6 *Harr. & Johns.*1; *S. C.* 5 *Harr. & Johns.*392; *Gallego's Exr's vs. Atty. Gen.* 3 *Leigh's R.*450,

Are the objects of the present trust *definite?* Is there any general rule or criterion by which it can be positively determined who are and who are not " such of the poor of Kent County as by timely assistance would be kept out of the Poor House, and who but for such assistance would go there"? Or, does it not rather depend upon a great variety of considerations entering into each case, such as the pecuniary circumstances, moral character, habits, health, age, sex, standing in society and even family relationships of the individual? If so, then the answer to the question, who are the objects of the given description, is mere matter of *opinion,* varying with every man's judgment, is subject to no *rule,* and is, therefore, *uncertain.*

2. The objects are further uncertain in this respect, that there is *no effectual provision for their selection:* so that no *cestuis que trust* can ever be brought into being and invested with rights to be asserted in a court of equity.

A devise to " *twenty of the poorest of testator's kindred*" has been held to be void for the reason that it cannot be adjudged who are such persons, so a devise " *to the two best men of the white Towers*". 1 *Powell on Dev.* (362) 21 *L. L.* 214. So if this were a devise *directly* to the " poor of Kent County &c.," it would be clearly void; because under such a description no one could establish a right. To render uses of so general a nature complete, it is at least essential that there should be provided some medium for ascertaining and designating the *individuals* of the class. For only thus can any become invested with an interest so as to call upon a court of equity to enforce the trust.

The same result follows whether the testator creates a general use, without any provision at all for the selection of the objects, as in the cases cited from Powell; or whether he attempts *ineffectually* to make such provision. Of the latter an instance is found in *Baptist Association vs. Hart's Exr's* 4 *Wheat. R.* 1.

In the present case there is an *ineffectual* attempt to provide a mode for the selection of the object—" the apportionment and distribution thereof to be made by agents to be appointed by the Orphans' Court or the Levy Court of Kent County, as may deemed most proper." Under this provision the power of selection is vested nowhere. It

54

does not exist in either of the Courts named *solely*, nor in *both together*. It is wholly indeterminate.

There is no power in the Court, acting within its general equity jurisdiction, to remedy this defect. It is not the want of a trustee to carry into effect a perfect and valid use, but it is a *defect in the use itself*, rendering it impossible to bring into existence any *cestui que trust*. And until the *cestui que trust* is first ascertained and designated, the Court, which in its general jurisdiction acts only upon a bill filed between parties, can take no step in the matter.

II. This brings us to the next great question, viz:—Assuming the trust to be uncertain and indefinite—such as cannot be executed upon principles governing trusts at large—yet is it good as a charitable use, according to the English doctrine of peculiar favor to charity, as held prior to 9 Geo. II?

The doctrine referred to was this;—that *charitable uses* were objects of favor—that " the motive of the gift and the purpose to which it was to be applied, distinguished such uses above all other appropriations of property and entitled them to peculiar favor." (*Sergeant's argument of the Girard will case*, 226,)—So much so, that what the testator had shown a disposition to devote to charitable purposes should *in no event* go to the heir; so that if the purposes named were *illegal* the court would devote the property to other uses of a charitable nature. And if the objects were *uncertain*, so that none could claim in a court of equity by bill, the disposition fell to the king *as parens patriæ*, and was made through the Chancellor as the delegate of the crown, upon an information filed by the Atty. Gen. 2 *Story's Eq. Jur.* 1165–1173.

To the adoption of this doctrine here, and to the exercise of the powers involved in it, we object upon several grounds;—

I. Charitable uses, which were void upon principles applicable to other trusts, derived their validity from the Stat. *Char. Uses.* 43 Elizabeth which is not in force in this State.

The question is not whether chancery derived its *whole* jurisdiction over charitable trusts from that Statute. Undoubtedly it has always possessed the same jurisdiction over charitable uses, as over all other trusts; but that the *extraordinary jurisdiction peculiar to charitable trusts*, which came to be exercised, grew out of the Statute of Elizabeth, will be evident from many considerations.

1. *One arises out of the Statute itself.*—The preamble, reciting certain "breaches of trust &c.," manifestly has reference to a class of trusts for enforcing which there had been no previous remedy· Compare the preamble of our act enabling religious societies to purchase lands for certain purposes.—*Digest Del. Laws* 457. See also the comment of Marshall, C. J., in the *Baptist Association case,* 4 *Wheat. R.* 1 ; and of the Virginia Court of Appeals in *Atty. Gen. vs. Gallego's Ex'rs.* 3 *Leigh's R.* 450.

Hence, the creation of a new and peculiar jurisdiction, that of commissioners, armed with inquisitorial powers, unknown to a court of equity, and clearly designed for the very purpose of reaching trusts for *uncertain* objects, of which, for want of parties, chancery had previously been unable to obtain cognizance so as to enforce them.

2. The decisions *subsequent to the Statute* determine its construction and effect in accordance with our view.

In the text of 2 *Fonb. Equity* 213. *Part* 2 *chap.* 1, *sec.* 2. written as early as 1728, we are told that the *intent* of the Statute was held to be " to make the disposition of the party as free and easy as his mind ;" and that to carry out this intent the words " limited and appointed " were laid hold of as " supplying all defects of assurance *either in the giver or receiver*, where the donor is of capacity to dispose, and hath such an estate as is in any way disposable by him." See also 2 *Black. Com.* 375–6.

This testimony is confirmed by a series of judicial decisions, running through a period of one hundred and fifty years next following the Statute (passed in 1601), in which charitable trusts held to be void upon general principles for every variety of defect, both in the instrument creating the trust and as to uncertainty of the objects, were adjudged valid and enforced *expressly by force of the Statute.  Duke's Char. Uses* 355 ; 2 *Bac. Abr. Char. Uses* (*E.*)*; Flood's case, Hobart* 136, *Duke* 372,3 (1616); *Collison's case, ib.* (1618) ; *Christ's Hospital vs. Hawes, ib.* 370, (1620) ; *Stoddart's case,* 1 *P. Wms.* 247, *Duke* 373 (1622); *Platt vs. St John's College, Finch* 221, 1 *Chan. Cas.* 267, *Duke* 379 (1638) ; *Rex vs. Newman, Levinz* 284 (1657) *Parish of Great Creaton vs. Palmer's Exrs.* 1 *Chanc. Cases* 195 (1658) ; *Atty. Gen. vs. Rye,* 2 *Vernon* 453, *Duke* 382 (1703) ; *Atty. Gen. vs. Burdett,* 2 *Vern.* 755, *Duke* 385 (1717); *Atty. Gen. vs.*

*Sawtelle,* 2 *Atk.* 497, *Duke* 395 (1742); *Atty. Gen. vs. Andrews* *Ves. Sr.* 225 (1748).

3. There is further evidence that the doctrines peculiar to charities were settled upon the Statute of Elizabeth. In cases adjudged since the statute, trusts for charitable purposes, in the general sense of the term charity, have been held void as indefinite trusts and not enforced *because they were not within the technical sense of charity as contemplated by the Statute. Morrice vs. Bishop of Durham,* 9 *Ves. Jr.* 399, 10 *Ves. Jr.* 522 ; *James vs Allen,* 3 *Mer.* 17 ; *Brown vs. Yeale,* 7 *Ves. Jr.* 50, *note* (*a*) ; *Ommaney vs. Butcher,* 1 *Turn. and Russ.* 260 (11 *Eng. Ch. R* ) ; *Vesey vs. Jamson,* 1 *Sim. and Stu.* 69 (1 *Eng. Ch. R.); Williams vs. Kershaw,* 1 *Keen* 230 (15 *Eng. Ch. R.); Ellis vs. Selby,* 1 *Mylne and Craig* 286, 293, 299, (13 *Eng. Ch. R.*); 2 *Sto. Eq. Jur. sec.* 1158.

4. *As to cases prior to the Statute*—they should be numerous and well authenticated, and should show a clear and well established jurisdiction at that period over charitable uses void at law, in order to rebut the argument founded upon the plain construction of the Statute and upon the subsequent cases adjudged in such numbers expressly upon its provisions.

In fact there was no settled system at all of equity jurisprudence prior to the Statute of Elizabeth. Up to 1592 no lawyer had sat on the Chancery Bench for three centuries excepting Sir Thomas More, who was appointed by Henry VIII in 1530. 3 *Blk. Com.* 53–55. And considering the rapacity of the church, and the superstitious devotion of the people, and the fact that the Chancellor was for the most part an ecclesiastic, it would not be surprising if attempts had been made to introduce the civil law doctrines of *favor to charity.* However this may be, the uniform resort to the Statute after its passage to sustain these doctrines, sufficiently shows that independently of its provisions equity jurisdiction was considered inadequate to carry these doctrines into effect.

But the cases anterior to the Statute do not show that any extraordinary jurisdiction in regard to charitable uses was even attempted to be exercised at that period.

The large number of cases collected by Mr. Binney in his argument of the *Girard will case* (pp. 129—137) show only that chancery had *some* jurisdiction over *charitable* trusts—such as it had over all

trusts.  But that it had then an *extraordinary* jurisdiction in regard to charities over and above that which applied to other trusts, the cases do not prove.    For (1) not a *decree* in a single case is given.

2) Being taken only from *indexes* of the original records, it does not sufficiently appear what were the facts and circumstances of the cases.    At least half show nothing but the names of parties and the general object of the bill.    (3) Of the rest, so far as the facts appear, they may all have been enforced upon general principles without resort to any *extraordinary* jurisdiction.

On the other hand there are cases to be found prior to the Statute in which such indefinite charitable trusts are treated as being without a remedy in equity, while, if the remedy had existed, it must be supposed that resort would have been had to it.    *Porter's case*, 1 *Co. Rep.* 22, as commented on by Marshall, C.J. in *Baptist Association case*,4 *Wheat. R.* 1 ; *Partridge vs. Walker,* 4 *Co. Rep.* 116. *b ; Martindale vs. Martin,* Cro. *Eliz.* 283 ;  *Thetford School case,* 8 *Co. Rep.* 130.

II.  Another general reason why the English doctrine of charita‧ ble uses cannot aid this case is,that even after the Statute 43 Elizabeth gave validity to *indefinite* charitable trusts they  were carried into effect by a  jurisdiction wholly distinct from that of equity. The present equity  jurisdiction of our court could not reach  such uses, even if they were recognized by law as valid.

The proper equity jurisdiction of the court is exercised only upon a bill filed by parties having an interest in the subject matter.    But if a trust is *uncertain* in the sense of the law, no one can show an interest ; no bill can be filed ; no cognizance obtained.

In view of this very defect the Statute provided for a *commission*, which might proceed *ex parte* to inquire after and enforce uses so vague and indefinite that it was impossible, for want of parties, to bring them within  the jurisdiction of a court of equity.

The validity of indefinite charitable uses being established, by the Statute, the proceeding by information came to be resorted to and altogether superseded the commission.    About the year 1675, the commission was abandoned and informations became the uniform mode of enforcing uncertain charitable uses. *Powell on Devises*, 21 *Law Lib.* 215. *n ; Atty.  Gen. vs.  Matthews,* 2 *Levinz,* 167

(1675) ; *Atty. Gen. vs. Peacock, ibid.* (1675) ; *Atty. Gen. vs. Syderfin.* 1 *Vernon* 224 (1683) ; *Atty. Gen vs Baxter,* 1 *Vernon* 248 (1684); *case in Freeman's Rep.* 261 (1702); *De Costa vs. De Pas. Ambler* 212 (1754) ; *Atty. Gen. vs. Clark, ibid* 422 (1762 ) ; *Atty. Gen. vs. Herrick, ibid* 712 (1792) ; *Moggridge vs. Thackwell,* 7 *Ves. Jr.* 35 (1802) ; *Mills vs. Farmer,* 1 *Mer.* 54 (1815).

It has been expressly decided th&#x26;t an indefinite charitable use cannot be enforced *except by information. Morrill vs. Lawson,* 4 *Viner's Abr.* 500 ; *Well Beloved vs. Jones,* 1 *Sim. and Stu.* 47. (1 *Eng. Ch. R.*)

The proceeding by information to establish a charitable use does not belong to the equity jurisdiction of the English Court of Chancery, but is founded upon a royal prerogative exercised by the Chancellor as the personal delegate of the crown. The power is not *judicial ;* it is a *sovereign* power, vested in the king as *parens patriæ* and delegated to the chancellor as the nearest representative of the crown. It stands upon the same footing with his guardianship of *infants* and *lunatics.* 3 *Black. Com.* 46, 427.; *Cooper's Equity* 27.

Under our Government such a power does not belong to the Chancellor as an equity judge. It must be conferred by the legislature ; which has already by an express statute invested him with the care of *idiots,* and has given to another tribunal the guardianship of *infants. Dig. Del. Laws* 305 ; 9 *Del. Laws* 480 &c ; *Gallego's Exr's. vs. Atty. Gen.* 3 *Leigh's R.* 450.

In North Carolina the power of enforcing charitable uses by information is conferred by statute. 2 *Bac. Abr. (new ed.)* 194; 1 *Hawks' Rep.* 96.

III. A third general objection to the English doctrine arises from a consideration of its origin, character and consequences.

*This doctrine is not one of necessity.*

It is not true that " uncertainty is the life of charity." Though a charitable use must of course be for *general* objects, rather than for individuals, yet it does not follow that there *must be uncertainty. Id certum est quod certum reddi potest* ; and the objects, though uncertain *in the first instance,* can well bo rendered certain by creating a power of selection and appropriation. Then, it is a doctrine not of *protection* to charity, but of *special favor. Sergeant's argument in Girard will case* 226.

*Again, the doctrine under consideration requires the exercise of powers that are extra-judicial and dangerous.*

All appropriations of property by the owner, made in legal form and for lawful purposes, are entitled to the same favor. To discriminate is an infringement of the right of property. The power to discriminate at all is an arbitrary power admitting of no safe limit. The *rule of certainty* is not one of *discretion* with the court, but is a limit to its authority and cannot be dispensed with to give effect to any disposition of property.

By what *certain rule* shall it be determined what are and what are not charitable uses? In England the essence of charity is *public benefit* In this country what are objects of public benefit is the subject of a thousand conflicting opinions. No rule can determine it. To leave it to the *unbounded discretion* of a chancellor would be incompatible with a government of law. Such a discretion would be arbitrary and unsafe. *Burr's Ex'rs vs. Smith,* 7 *Vern.* 317.

*Still again, this doctrine was adopted and employed for purposes inadmissible under our institutions.*

It is not the principle of *benevolence* or *relief to necessity or suffering* that constitutes a charitable use an object of favor in the English law. Objects of simple *benevolence* have been excluded from the operation of the Statute of Elizabeth. *James vs. Allen* 3 *Mer.*17. So, a gift to *private charity* is held not to be within the statute. *Ommaney vs. Butcher,* 1 *Turn. and Russ.* 260 (11 *Eng. Ch. Rep.*) Many of the objects enumerated in the statute have in them nothing of the principles of charity in its proper sense. And under its construction gifts of the most enlarged benevolence have been repudiated because the objects were dissenters from the established religion. *Baxter's Case,* 1 *Vern.* 248.

The doctrine had its origin in the Roman Law, and sprang directly from the religious fanaticism of Constantine and his age. Then gifts to charity were synonymous with gifts *ad pias causas* and gifts *pro salute animæ. Shelf on Mort.* 513, 14, 37 *L. L.* 356-7; 2 *Story Eq.Jur.* 1137-39, 40, 41 ; *Lord Thurlow, in White vs. White,* 1 *Bro Ch. R.* 12; *Lord Eldon, in Mills vs. Farmer,* 1 *Mer.* 94.

The same false religious spirit, only modified in its form according as the catholic or protestant faith prevailed, favored its introduc-

tion into England. In the ages preceding the reign of Elizabeth the charities of the people were dispensed solely through the church, greatly augmenting its power and resources. Charity was enjoined as a religious duty, essential to salvation. Besides, there was no provision *by law* for the poor until the reign of Elizabeth, although the impoverishment of the lower classes was so extreme in 2 and 3 Edward VI—that the king was obliged to surrender his fee-farm for three years for their relief. No wonder then that the statute 43 Eliz. was laid hold of to introduce a doctrine so consonant with the feelings of the people and the interests of both Church and State.

*We further note in this history that the doctrine proved to be mischievous and led to the Mortmain Act of 9 Geo. II.*

After it became too firmly established to be shaken, the judges felt its absurdity. In *Atty. Gen vs. Herrick Amb.* 712, Ld. Bathurst said, "he was inclined to favor the heir but the precedents were too many and too strong to contend with." In *Moggridge vs. Thackwell,* 1 *Ves. Jr.* 474, Ld. Thurlow says, " if the rule of the court had not been so distinctly established the question might undergo a different consideration." In the same case in 7 *Ves. Jr.* 86, Ld. Eldon pronounces it " strange doctrine;" and in *Mills vs. Farmer,* 1 *Mer.* 99, he says that *Moggridge vs. Thackwell* was decided by the force of authority, " much against his inclination."

Ld. Hardwicke, in 1 *Ves. Sr.* 223, 2 *Madd Ch.* 61, says that " the clergy got almost half the real property of the kingdom in their hands ;" and he wonders they did not get the rest, " as the people thought they thereby purchased Heaven."

Against these evils the mortmain act was expressly directed. *Atty. Gen. vs. Weymouth, Amb.* 23 ; *Atty. Gen. vs. Day,* 1 *Ves. Senr.* 220. The act was held to be of so remedial a character that its provisions have been enforced with extreme rigor. *Shelf on Mort.* 122, (36 *L. L.* 101.)

IV. A fourth reason why the English doctrine cannot avail in this case is that by the modern decisions it is held to apply only to charities of *a public nature* and not to a *private charity. Ommaney vs. Butcher,* 1 *Turn. and Russ.* 260, (11 *Eng. Ch. R.*) is a strong case on this point.

In the present case, the trust is for *private charity,* the testator

expressly forbidding the application of the fund in the way of *public charity.*

If the devise cannot be effectuated as a *private* charity it cannot be applied by any other mode, the testator having expressly restricted it to the private channel. Even in England, if the testator's intention were *expressly restricted* to one purpose, the *cy pres* doctrine was not pressed so far as to substitute another purpose contrary to a *positive intention.* This doctrine, though perverted in its application, proceeded upon the hypothesis that the testator had a *general* purpose of charity, and was indifferent as to the particular mode of effecting it. 2 *Sto.Eq. Jur. sec.* 1182; *Corbyn vs. French,* 4 *Ves. Jr.* 418; *Atty. Gen. vs. Bishop of Oxford,* 1 *Bro. Ch. R.* 444, *note; Duke* 531.

V. The decision in the case of the *State vs. Wiltbank's Adm'r,* 2 *Harring. R.* 18, shows that the English doctrine of charitable uses has not been considered as obtaining in this State.

That was a devise of the proceeds of the sale of a testator's real estate to the trustees of the M. E. Church in Dover, in their corporate capacity, " to be applied by said trustees in such manner as they shall devise, towards educating poor children of members of said Church."

The Court held that the trustees were incompetent to take and execute the trust, under the act relating to religious societies (*Digest* 457), and upon this ground the decision rested. Now, the English doctrine of charity would have substituted some other discretion to select and educate these poor children ; and the doctrine was fully discussed by the counsel. The fact that the Court decided the case without reference to the doctrine shows that they did not consider it of any force in our courts.

It can hardly be supposed that in the *Wiltbank case* the use itself was void ; *i. e.* that it was unlawful to create a trust for the education of poor children in the M. E. Church. Nothing in the case shows that it was so considered. No such ground was taken. But, supposing it to be so, still the English doctrine would not have suffered the fund to go to the next of kin, but would have applied it to some lawful charity, as near as might be to the testator's intent. The devise would not have failed, had the English law of charity been received in this State.

*Second.* The second ground upon which we consider this trust as void, is that *it creates a perpetuity in real estate.*

The testator, expressly forbidding a sale of the estate, directs the trustees to receive the rents and profits forever, and to pay them over to the executors, in whose hands they are to constitute the fund for distribution. The existence of the fund thus depends upon the lands being held in perpetuity.

It is a long settled and inflexible rule, founded upon the highest policy, that by no device shall land be kept inalienable longer than a life and lives in being and twenty-one years afterward, even in the case of a beneficial holder. 4 *Cruise's Dig. Title Deed. chap.* 26,*sec.* 1.

It is also a rule, founded upon the same policy, that the use in land.or the *beneficial ownership* shall not be separated from the *possession and control* of it for longer than a like period. This is the law of springing and shifting uses. 4 *Kent's Com.* 297.

A perpetuity *in trust* is the most obnoxious of all kinds. It not only renders the land inalienable but keeps it forever in the hand of a trustee without an interest in it, thus putting it in a condition of certain eventual depreciation and ruin.

It is incumbent upon our opponents to show *some sufficient reason* for exempting this trust from the rule merely because it is for a charity. In England charities were exempted from the rule against perpetuities under the doctrine already referred to, founded on the Statute of Elizabeth, which was expressly held to repeal the statutes of mortmain in favor of charitable uses. This answers all that is said in *Lewis on Perpetuity* 689 (52 *L. L.* 438). That only shows what was the law of charitable uses under the Statute.

To say that a trust for charity, *fastened upon land,* necessarily creates a perpetuity,is what we admit. But this is not assigning a *reason* why land should be suffered to be so locked up, even for such a purpose. And as an abundant channel for the diffusion of charity may be found in gifts of *personal* estate, or in the gift of land with the liberty to convert it into money, it would be difficult to find any sound reason,or any necessity,for relaxing the laws of property and unsettling a wise and well established policy, in order to afford a larger scope even for the exercise of charity .

By the act relating to religious societies of 17 George II., *Dig. Del. Laws* 457, religious societies in this State were first enabled to take and hold real estate, and that only for burying grounds and for *erecting* churches, schools and almshouses.

What was the necessity for this act ? By what law were religious societies previously disabled from taking land, even for building a church, unless it was the general law against perpetuities under which no trust could be fastened upon land forever ? The act is evidence of a law of perpetuity in this State, even as to charitable uses; and it is evidence that the doctrine of charitable uses founded upon the Statute of Elizabeth never was in force here.

*E. W. Gilpin,* Attorney General, and *J. P. Comegys,* for the State.

The devise in the 18th item of Mr. Potter's will carries the fee, and vests it in the *trustees* therein named. This is the legal effect of the words, " all the balance or *residue of my* ESTATE, real, personal and mixed." The word " *estate* " carries the fee.

The *intention of the testator, as manifested by the trusts of the will,* shows conclusively that the *heirs at law should take nothing ;* and the *intention* in wills, especially where *charity* is the object, should always govern.

The creation of the trust must rule the construction to be given to the will ;—to ascertain the *extent* of the *legal estate,*you must look to the *scope and objects* of the trust. And it may be laid down as an established rule that, wherever a trust is created, *a legal estate sufficient for the execution of the trusts shall be implied. Lewin on Trusts,* 234, (24 *Law Lib.*)

In some cases the court will *supply* the legal estate *in toto,* and in other cases *extend* the legal estate. *Lewin on Trusts,*234 ; 5 *Mod. R.* 63 ; 5 *East R.* 162. In this case the trust is for the establishment of a permanent charity; and nothing short of the *fee* is sufficient to enable the trustees to execute it.

The fee in the lands having once vested in the trustees under the will, their subsequent renunciation of the trust is of no effect. Nothing short of their decease, or a conveyance by deed, or their removal by a court of equity, can divest the legal estate out of them.

They may refuse to perform the trusts of the will ; and this they have done by their renunciation. *But they cannot defeat or destroy the charity.*

But, it is hardly necessary to inquire whether the trustees took any or what estate under the will and codicils. If they took no

estate, then the devise is treated in equity as a direct disposition to charitable uses; and,as such,it is as valid to all intents and purposes, as if trustees had been interposed in whom the legal fee had vested.

It is settled, that the beneficiaries of a charity are entitled in a court of equity to have the valid trusts of the will protected, whatever may be the defects of the legal estate. This principle has never been questioned by any decision in this country or elsewhere.

Whether the estate of the intended trustee be void or not, or fail from any cause; whether a trustee be named or not; or whether he renounce the trust, are matters of no importance.

The rule is without any exception whatever, that *a trust shall never fail for want of a trustee.* The land itself *is bound by the trust,* no matter where the legal estate may be; for in equity *the trust is the estate.* 1 *Sug. on Powers,* 135 &c.; 2 *ib.* 174; *Pitts vs. Pelham,* 1 *Levinz R.* 304. Neither negligence of the donee, nor refusal of the trustee to accept the trust, nor accident, nor any other contingency or circumstance, will be allowed in a court of equity to defeat the trust. 8 *Ves. Jr.* 574. This principle applies both to the renouncing trustees and to the agents for distribution, who are also trustees for the purpose of distribution. If the Orphans' Court or the Levy Court should not appoint, the Court of Chancery may appoint. In *Walker v. Doyle,* 1 *Cha. Ca.* 180, where executors authorized to sell land *died before sale,*the heirs at law were treated as trustees and decreed to sell. Where trustees of charity die in the life time of testator, the management of the charity shall go to the heirs at law, but the charity shall be established. *Atty. Gen. vs. Downing, Ambler R.* 571:

In the case of *Atty. Gen. vs. Hickman,* 2 *Eq. Cas. Ab.* 193, which was the case of a *charity,* of an uncertain, indefinite character, the Chancellor established the trust, although the trustees had died before the testator. And the Lord Chancellor, King, in this case declared,that although by the death of the trustees, the legal estate of the legacy was gone, and the charity could not be disposed of by the very hands which the testator designed should have done it, *yet the charity itself, which is the substance and reason of the devise is still subsisting and may be as fully answered by the directions of this Court as if the trustees were living.*

The same principle is established in the case of *Sonley vs. The Clockmakers' Company.* 1 *Bro. Ch. Rep.* 81. There the devise was void under the mortmain laws, being given to a corporation; but the Court established the trust. In the language of Baron Eyre, the trust was sufficiently created *to fasten itself upon any estate* the law might raise.

And it is upon this principle, namely, that the trust " *is tied to the estate,*" that the trust "*is fastened to the estate*"—that the trust "*is the estate,*" that courts of equity have disregarded the fact of whether there was a trustee or not, and have invariably executed the trust. *McCarty vs. Orphans' Asylum,* 9 *Cow. R.* 484.

It is said by Lord Chancellor Thurlow, in the case of *Moggridge vs. Thackwell,* 1 *Ves. Jr.* 475, that it is known universally that a trust legacy can not lapse because the trustee dies, but it survives for the benefit of the *cestui que trust.*

It is a settled principle in equity that a trust shall never fail for want of a trustee. 2 *Sto. Eq. Jur. sec.* 1059.

All charitable uses at common law are trusts, and as such are within the the jurisdiction of chancery. It is because they *are trusts,* that equity takes cognizance of them. *Atty. Gen. vs. Iron Mongers' Company,* 2 *Myl. and Keen,* 581, (8 *Eng. Ch. Rep.*)

The great question, however, upon the subject of charity, in the courts of this country, has hitherto been whether the jurisdiction of chancery, in cases of *vague, indefinite and uncertain charities,* is to be referred to the Statute of 43 Elizabeth, or to *the general original jurisdiction of the court.* Since the passing of the Statute, and under it, the Court has certainly and rightfully exercised jurisdiction in cases of the most *vague, indefinite and uncertain* description, and no one ever questioned its authority.

But the question now is, had the Court jurisdiction over these *vague, indefinite and uncertain* charities before the Statute ?

If it had, then we contend that this Court must sustain and establish the charities of this will. And that it exercised such original jurisdiction before the Statute, we think is settled very conclusively by a multitude of decisions, both in England and in this country.

In the case of the *Atty. Gen. vs. Mathews,* 2 *Levinz R.* 167, the trust was for " *the poor in general forever,*" and the commissioners under

the 43 Elizabeth having made a decree in the matter, the Lord Keeper, Finch, quashed the decree, because, being a charity for the poor in general, the commissioners had nothing to do with it; and he ordered proceedings to be instituted in chancery.

In the case of *Eyre v. Shaftsbury*, 2 *P. Wms.* 119, the jurisdiction of chancery *before* the 43 Elizabeth is expressly asserted.

The same doctrine is held in the cases of the *Atty. Gen. vs. Lock*, 3 *Atk.* 165; *Atty. Gen. vs. Brereton*, 2 *Ves. Sr.* 425, and *Atty. Gen. vs. Middleton*, *ib.* 327. See also the case of *Atty. Gen. vs. Tancred*, 1 *Eden* 10; *S. C.*, 1 *W. Black* 90.

In the case of the *Atty. Gen. vs. the Mayor of Dublin*, 1 *Bligh* 347, Ld. Redesdale is reported to have said that the Statute created *no new law*. This case was before the House of Lords from the Irish chancery and brought up the question of the origin of chancery jurisdiction over charities generally before the Statute, and it affirmed the existence of such jurisdiction. To the same effect is 1 *Bligh* 61, and the case of the *Atty. Gen. vs. Brentwood School*, 1 *Myl. & K.* 376, (7 *Eng. Ch. R.*), where Sir John Leach, in 1833, speaking of a devise to a corporation in 1565, says that at the latter period chancery had original jurisdiction of charitable uses. To the same point are cases cited in *Mr. Binney's argument*, 126, and also fifty cases collected by him from the report of the commissioners.

It is objected that the objects of the charity are vague, indefinite, uncertain; that no estate or interest passes to or vests in any existing *cestuis que trust*, or in any one susceptible of ascertainment, and that even in case they could be ascertained they would be wholly incapable of transmitting their equitable interest in perpetual succession.

The argument is in fact, that the charity does not now and never can vest in any one; that it is not within the competency or power of any one or more of the poor of the County of Kent to show that he or they were intended to be benefited by the charity, and that they are not therefore capable of enforcing their claim as beneficiaries, either at law or in equity.

The same objection might be taken to all dispositions of property by appointment under powers. The persons to be benefited by the appointment of the donee of the power are altogether unknown and

uncertain. Until the appointment is made the matter remains executory; but the moment the power is exercised and the appointment made, the object intended to be benefited becomes ascertained and certain, and he acquires such a vested interest as may be enforced at law or in equity.

In the case of individuals this uncertainty is limited as to time, and cannot continue beyond a life or lives in being and twenty one years and nine months; but in the case of a charity there is no such limitation; it is permanent and perpetual; it shall never fail.

In this case, the Levy Court or Orphans' Court for the county may make the appointment, that is to say, may make the selection of the agents for distribution; but if they fail to do so the Court of Chancery will perform this duty, select the agents, and thus execute the trusts of the will, carrying out the charitable intentions of the testator. Where is the difficulty? The objects to be benefited are " the poor white citizens of Kent County generally" without the walls of the poor house. Can they not, from time to time, be ascertained and made certain by selection and appointment as proper beneficiaries of the charity? The *general class* is certain enough, namely, " the poor white citizens of Kent County " not being in the Poor House. The *particular objects* belonging to that class are capable of being made *certain* by selection; and, when thus ascertained, they become the equitable owners of that which the testator intended they should enjoy.

It is objected that there is no capable or competent party to institute proceedings in chancery to have the charity established and executed. Our answer is that the trustees could have done so. Any poor white citizen of Kent County can do so for himself and the other poor of the County. The Attorney General, of his own mere motion, or upon the information of others, is competent to bring the charity before the Court; and then the Court, as matter of right and duty peculiarly belonging to its jurisdiction, will take upon itself the execution of the trusts. 1 *Ves. Jr.* 464–475; 3 *Bro. Ch. R.* 517; 7 *Ves. Jr.* 36; 2 *Shelf. on Mort.* 42, 44, 45.

It is a matter of no moment how the subject gets before the Court, or at whose instance; if it be a charity without trustees to administer it, the Court will take charge of it, without reference to the fact

of who is the complainant. 2 *Kent's Com.* 286–288 ; 7 *Paige R.* 77. The trustees of the poor might be the complainants. *West vs. Knight*, 1 *Ch. Cas.* 134. A bill might be filed against the Attorney General and the heirs. *Powell vs. Atty. Gen.* 3 *Mer. R.* 48. The *mode* of distribution is not important ; the charity is the substance. 2 *Sto. Eq. Jur.* § 1167.

The case of *Dummer vs. The Corporation of Chippenham*, 14 *Ves. Jr.* 245, was a charity for the education of twelve poor boys, the support of a free school, and provided for the appointment of their schoolmaster by the bailiff and burgesses. The complainant was appointed by the bailiff and burgesses of the corporation. He filed his bill to have the charity established in his favor, and it was so decreed.

Suppose the agents of the Levy Court of Kent County were to make a selection and appointment of certain *poor white citizens of Kent*, could not they file their bill to have the charity executed ? The case is precisely similar to the above.

In the case of the *Atty. Gen. vs. Mayor of Dublin*, 1 *Bligh*, *R.* 347, the Lord Chancellor says, "the right which the Attorney General has to file an information is a right of prerogative. The king as *parens patriæ* has a right, by his proper officer, to call upon the several courts of justice, according to the nature of their several jurisdictions, to see that right is done to his subjects, who are incompetent to act for themselves, as in the case of charities and other cases."

The State has a right to do the same thing, through her proper officer, *i. e.*, to see that justice is done to her citizens.

A gift or bequest to "charity" generally is good, though the objects to be benefited are uncertain and unknown and the disposition of the charity, by the English law, if there are no trustees named, is in the King, who administers the same through the Court of Chancery. And where the execution is to be by trustees, with general or some objects pointed out, there the Court will administer the charity in virtue of its original power. *Moggridge vs. Thackerell*, 7 *Ves. Jr.* 36 *to* 87 ; *Atty. Gen. vs. Hickman*, 1 *Eq. Ca. Ab.* 193 ; 1 *Jarman on Wills*, 218–219.

Where no objects or class of objects is pointed out, and no trustee named, as in a bequest to "charity" generally, then the disposition is in the king, and is administered by chancery, 2 *Lev.* 167 ;

*Amb.* 712. But if the objects, or class of objects,is pointed out, there the trustee ; or, if there be no trustee or if he refuse to act, a court of equity will administer the trust. 7 *Ves. Jr.* 87.

A gift of the interest of £4200, to " *the poor inhabitants of St. Leonard, Shoreditch," Atty. Gen. vs. Clark, Ambler* 422, is a good charity,such as chancery will administer ; and,in doing so,it will construe the bequest to mean the *uncertain* poor of the parish not receiving alms under the poor rates. See also *Waller vs. Childs, Amb.,* 524; *Atty. Gen. vs. Herrick, Amb.* 712 ; *Shelf on Mort.* 628, 629 ; 3. *Russ. R.* 395; 2 *Bro. P. C.* 370 ; 7 *Bro. P. C.* 235.

*Uncertainty of individual objects at the time of the gift,* is characteristic of charity. If the beneficiaries are *ascertained* and *individualized* by the donor, it is a mere trust in a restricted sense, and not a charity. If it is a charity, no matter how uncertain it may be, chancery will protect it.

" It is settled," says Sir Wm. Grant in the case of *Morrice vs. The Bishop of Durham,* 9 *Ves. Jr.* 404, upon authority which it is too late to controvert, that, where a charitable purpose is expressed, *however general,* the bequest shall not fail on account of the *uncertainty of the object.* The Court of Chancery will exercise control *over every species of trust.* If it be a *mere trust* (not charity) but to *uncertain objects,* the property is undisposed of and will go to the heir at law. But this doctrine *does not hold good with regard to trusts for charity.* 7 *Ves. Jr.* 36 ; 1 *Meriv.* 98 ; 2 *Shelf on Mort.* 514, 518 ; 1 *Powell on Dev.* 215, 366, *note* 1.

The same words in a will, when applied to the case of *individuals,* may require a different rule of construction from that which would govern in the case of a charity. 2 *Shelf on Mort.* 519 ; 9 *Ves. Jr.* 40 t.

To give effect to a bequest in favor of a charity the Court will not only supply the place of an executor or trustee, but will give such construction to the will as will carry into effect that which, in case of individuals, would have failed altogether. 7 *Ves. Jr.* 36 *to* 87 ; 1 *Meriv.* 98. In 2 *Shelf. on Mort.* 519—522, neither trustees nor objects are named, but there is a reference to a further appointment not made.

A devise " to the cause of Christ" for the promotion of evangelical piety and religion was held a good devise in Massachusetts. *Go-*

56

*ing vs. Emery*, 16 *Pick. R.* 107 ; so also a bequest to A. B. and C. and survivors &c. for the use of the " Board of Foreign Missions" was held valid. *Bartlet vs. King*,12 *Mass. R.* 537. So too, a bequest to the "American Bible Society," and to the " American Education Society," and to the " American Colonization Society." *Burbank vs. Whitney*, 24 *Pick. R.* 146 ; *Bartlet vs. Nye*, 4 *Metc. R.* 378. The whole law of charities in this country is fully set forth, and the jurisdiction of chancery fully sustained, in the case of *Sarah Zane's will*, to wit : *Magill et al. vs. Brown*, which was decided by Baldwin, Justice, in the Circuit Court of the United States. See also *Burr'sEx'rs vs. Smith*, 7 *Verm. R.* 241, and *Vidal et al. vs. The City of Philadelphia*, 2 *How. S. C. R.* 127.

The case of *Baptist Association vs. Hart's Ex'rs* has been fully overruled. *Bartlet vs. Nye*, 4 *Metc. R.* 378 ; *Burr's Ex'rs vs. Smith*, 7 *Vern. R.* 241 ; *Vidal vs. Philadelphia*, 2 *How. S. C. R.* 127 ; *Potter vs. Chapin*, 6 *Paige R.* 649 ; *Dutch Church vs. Mott*, 7 *Paige R.* 77. All grants, devises and bequests *to charitable uses* were good at common law. *Vaughn*, 356. All grants, devises and bequests in mortmain were good at common law. *Vaughn*, 356 ; *Coke on Litt·* 989; *Report of Sarah Zane's will case*, 17.

There is no statute of superstitious uses or of mortmain in this State. These statutes are in derogation of the common law, are extremely penal, imposing *forfeiture*, and they have never been adopted here.

The Statutes of Mortmain, prior to 43 Elizabeth, are 9 Henry III ch. 36; 7 Edw. I ; 13 Edw. I ; 15 Rich. II ; 23 Henry VIII ch. 10.

These Statutes never were in force here, because our ancestors brought over only *such laws as were useful to their new situation.* *Sarah Zane's will case*, 12. If they brought over any of these Statutes, it was the 43 Elizabeth,the principles of which are useful, and consonant with the spirit of our institutions and policy. And yet it is generally conceded that the 43 Elizabeth is not in force. Surely then, if this useful Statute has not been adopted, the mortmain acts, which are in derogation of the common law, and are so repugnant to the spirit of our institutions, have not been adopted.

The Statute 9. Geo. II does not apply to this country. The object of the act was wholly political, and so framed as to be quite inapplicable to any of the colonies. For, as observed by Sir Wm. Grant, "in its causes,its objects,its provisions, its qualifications, the act is a law wholly English, calculated for purposes wholly local,

complicated with local establishments, and incapable, without great incongruity in the effect, of being transformed to the code of any other country." *Atty. Gen. vs. Stewart*, 2 *Meriv.* 143; 1 *Shelf. on Mort.* 122.

No act made after a colony is planted is construed to extend to it without express words, showing the intention of the Legislature to be that it should. *Rex. vs. Vaughan*, 4 *Burr. R.* 2500; 2 *Meriv.* 156, *note (a)*.

The 9 Geo. II. does not apply to Ireland. *Atty. Gen. vs. Power*, 1 *B. & B.* 154; nor Scotland, *Mackintosh vs. Townsend*, 16 *Ves. Jr.* 338. It is not in force in Pennsylvania. Baldwin J. in the case of *Sarah Zane's will, pp.* 32, 33, 34.

No act of Parliament extended to the colonies, unless adopted by act of assembly, judicial decisions or established usage. *Morris vs. Vanderen*, 1 *Dallas* 67; *Respub vs. Mesca*, 1 *Dallas* 73. One of our statutes in its preamble (1 *Del. Laws* 64) recognizes this principle. It recites that " Whereas acts of Parliament have been adjudged not to extend to these plantations except when they are particularily named in the body of such acts," &c.

Our Statute of Mortmain is confined to " religious societies of protestants." *Digest* 447. It is similar to the law of Pennsylvania.

There is no such thing as an established church in the United States; no such thing as toleration where there is universal liberty of conscience. And, for the same reason, there is no such thing as a *superstitious use;* for all religious denominations are equal in the eye of the law, and equally entitled to favor and protection. The whole system of English legislation, therefore, is altogether inapplicable to this country.

What is charity? In a *limited sense* it is liberality to the poor, consisting in alms-giving or benefactions, or in gratuitous services to relieve them in distress. In a *general sense*, it is love, benevolence, good will—that disposition of heart which inclines men to think favorably of their fellow men, and to do them good. In a *religious sense*, it includes supreme love to God and universal good will to men.

From what source is the law of *charity* derived? Some say from the civil law. But it has a higher origin; it is derived from the

law of God ; it is part and parcel of the christian religion. Where-ever christianity took root and flourished, there the law of *charity* flourished with it.

The natural and revealed will of God is a part of the common law of England. 1 *Black. Com.* 42, 43. It is not natural to inquire *when* or *how* it became a part of the common law of England. It is enough to know as we do know, that it *is* part of the common law, and that it was such centuries before the Statute 43 Elizabeth. And since the law of charity was a part of the christian religion, and the christian religion a part of the common law of England, how can it have originated with the 43 Elizabeth or be dependent upon that Statute for its efficacy.

Is the law of charitable uses the law of this country ?

The answer is that our ancestors brought over with them the whole body of the law of England as it then existed, which was up-wards of eighty years after the 43 Elizabeth.

Can it follow that they did not bring with them this law, or at least the principles and spirit of the law ?

At all events they brought over with them the common law, which included the whole law of charitable uses. 1 *Del. Laws* 64. Equity is a part of the common law.

The common law of charitable uses has been recognized by deci-sions as existing in Massachusetts, Vermont, Connecticut, New York, New Jersey, Pennsylvania, North Carolina, Ohio and Ken-tucky. The decisions in these states maintain and establish the doctrine that there is a common law of charity, which existed ante-cedently to and independently of the 43 Elizabeth.

This law as to charities came over with our ancestors. It has been recognized by the decisions of Pennsylvania as having existed in that State from the time of its first settlement by the English under William Penn, in 1682.

Now, Pennsylvania and Delaware were colonized at the same time, by the same people, who brought over the same law—the common law—their birth right, 1 *Del. Laws* 64 ; and they were subject to the same government.

This law of charity—it is the law of God; it is part of the com-mon law ; it was the law of the colonists ; as such it became and has

ever been the law of Pennsylvania. Why then did it not become the law of Delaware? Clearly,it was our own common law when we became a Colony. Why then is it not our law now that we have be· come a Sovereign State?

By the Act of Union passed in 1682,(1 *Del. Laws,App.* 9), for an· nexing and uniting the three lower counties, it is expressly provided that "the people of the three lower counties shall be governed by the same laws and enjoy the same privileges in every respect as the inhabitants of Pennsylvania do or shall enjoy from time to time therein."

The law of charity in its fullest and broadest extent, has ever been and now is, the law of Pennsylvania; therefore, it must be our law.

We have shown that the law of charitable uses is a part of the common law of England, and that it has ever been such. By Art. 25 of the Constitution of 1776 (1 *Del. Laws, App.* 89) the common law of England is declared to be the law of this State; and also, so much of the statute law as has been heretofore *adopted in practice* in this State is declared to be the law of this State. Who ever heard of the 9 Geo. II, or any other English mortmain law, having been *adopted,* not in theory, but in *practice,* in the State of Delaware.

We maintain, that the "poor white citizens of Kent County" are entitled to the charity; that they have a propertyin it which is recognized by the law; and that, according to the language of the Bill of Rights, they ought to have remedy by due course of the law of the land, and ought to have justice and right for injury done to them freely and without sale,fully without any denial, and speedily without delay. 1 *Del. Laws, App.* 80, *Sec.* 12.

Our Court of Chancery is invested with power "to hear and determine all matters and causes in equity," 1 *Del.Laws* 130. It possesses full equity jurisdiction,as defined in 1 *Story Eq. Jur. sec.* 57. Its jurisdiction extends to all trusts, and, of course, to charities which are trusts. It is bound to execute the trusts of Mr. Potter's will.

We come now, in conclusion, to notice briefly the attempt to apply the doctrine of perpetuities to this case.

This doctrine has no application whatever to charities; and never has, before this case, been even suspected of being applicable to this subject. *Lewis on Perpetuity* 689, *margin.* It is the fact that a charitable use may be permanent and perpetual that distinguishes it from gifts to individuals.

The trust established in the "Shakers' Covenant" was held not to be void as being a perpetuity. *Gass vs. Wilhite,* 2 *Dana. R.* 170. The same principle has been decided in *Griffin vs. Graham,* 1 *Hawkins' R.* 96, and in the case of *Inglis vs. Sailors' Snug Harbor,* 3 *Peter's S. C. R.* 99.

The case of *Wiltbank's adm'r,* 1 *Harring. R.* 18, was much relied on, as shewing that the English doctrine of charitable uses is not in force in this State. But that case decides only one point, *i. e.,* that the trustees of the church, not being a corporate body, could not take the fund; and, moreover, that the devise was in contravention of our Statute in relation to religious societies. The case does not touch the question of equity jurisdiction over charitable uses generally.

*J. A. Bayard,* for the heirs at law, in reply.

I. Our first ground, and one which is decisive of the present case, is that, apart from and independent of the the Statutes of 39 and 43 Elizabeth, the Court of Chancery had no authority and exercised no jurisdiction to enforce charitable uses, except on the general principles applicable to other trusts; and that the jurisdiction, as now exercised in England, arose by usurpation under those Statutes, though it has since been referred to the ordinary jurisdiction of the Court.

We adhere to the position that, as a matter of judicial history, the Court of Chancery, prior to the Statute of Elizabeth, did not take jurisdiction to enforce charities vague and uncertain—charities limited to objects too uncertain to take as *cestuis que trust*; nor did the Court then supply defective conveyances to charitable uses. This conclusion was reached, upon the soundest reasons, in the elaborate opinion of Marshall, C J in the *Baptist Association case*; and it is needless to do more than to refer the Court to the reasoning of that case. Against this position reliance is chiefly placed upon the large number of early cases, prior to the Statute, which were cited by Mr. Binney in the Girard will case, and which seemed much to have influenced the mind of the Court in that case. But the just inference from those fifty old cases is that an attempt was made to establish a jurisdiction over indefinite charitable uses, which failed because it was so utterly inconsistent with the principles of law; and that

gave rise to the Statute of Elizabeth. We admit that charitable uses did exist and were enforced previous to the Statute, as were other uses ; but, if they were void at common law, either as defective conveyances or because they were limited to persons too uncertain to take as *cestuis que trust*, the court had not jurisdiction to enforce them ; and the Statute was passed to confer the necessary jurisdiction. If there was no such necessity, why, it may be asked, was the Statute passed ? It is said that its object was to vest a more convenient jurisdiction in commissioners. We deny it. The jurisdiction under that Statute was given to the Chancellor. He appointed the commissioners and modified and controlled their decrees. See the Statute at large; *Duke* 1; *Porter's case*, 1 *Co. R.* 22-4. Again, how is the existence of such a jurisdiction, prior to and independent of the Statute, to be reconciled with the undeniable fact that, after the Statute was passed, it was, to so large an extent, made the ground for sustaining gifts to charity which were void at common law ? Cases of this description are almost numberless. *Duke* 355–6, 362—395. Among the cases cited by Duke see *Davis' case, Rivet's case, Christ Church Hospital,* and *Holt's case.* It further confirms this view of the effect of the Statute that in England charity is a word of technical meaning, not to be confounded with charitable or benevolent purposes in the general sense, but is confined to such purposes only as are recognized by the Statute. Hence, gifts to private objects of charity, or to individuals merely as objects of benevolence, are not aided or enforced, if defective or uncertain, though gifts to repair a highway or for a school will be, because these are among the objects enumerated in the Statute. 9 *Ves. Jr.* 403 ; 10 *Ves. Jr.* 520, 539 ; 1 *Mer.* 85 ; 3 *Mer.* 17 ; 1 *Turn. and Russ.* 260 ; 1 *Sim. and Stu.* 69, 71.

I am aware that some judges have asserted the inherent, original jurisdiction of Chancery over charities. But these are *dicta*, and though coming from learned judges are not to weigh against the clear historical facts.

II. But, whatever sort of jurisdiction as to charitable uses may have existed prior to the Statute of Elizabeth, it is certain that the English doctrine of executing charitable uses *cy pres*, as it is termed, arose solely under that Statute, and is confined to such charitable uses as are enumerated in the Statute or to analogous cases. Under that doctrine where, in cases within the Statute, either the particular

charity indicated by the donor fails from any cause, or cannot be carried into effect in the manner or by the means appointed by the donor, or when the gift to charity is general, with no specification of any particular charitable use, the general purpose of charity should be carried into effect by means of a scheme reported by a master or by authority of the crown under the sign manual. In such cases the proceeding was by information in the name of the Attorney General. After the Statute this proceeding by information by the Attorney General was found more convenient, and the proceeding by commission provided by the Statute fell into disuse. See 2 *Black. Com.* 375 ; *case of Sarah Zane's will*, 17.

It is a fact, of much significance on this point, that no case can be found, where the Attorney General was made a party to enforce an indefinite charity, earlier than the year 1675. All the old cases cited in Mr. Binney's argument in the Girard will case were between private parties. *Atty. Gen. vs. Mallory*, 2 *Levinz* 167, is the first case in which the Attorney General ever sued. Another fact, equally significant, is, that informations by the Attorney General were not filed in cases not within the Statute, though they might be for objects of charity in the general sense. 2 *Vernon* 387.

III. Neither the forms nor principles of the doctrine of charitable uses as it is held in England, whether arising under the Statute of Elizabeth or otherwise, have ever been adopted in the State of Delaware, either while a Colony or as a State, nor have been recognized by usage, judicial decision or legislative enactment.

The Colonies carried with them such laws as were suitable to their condition, and none others. 3 *Binn.R.*596, *App.; Constitution of Del. of 1776, Art.* 25 ; *Constitution of 1792, Art.*VIII. *Sec.* 12. The English doctrine of charitable uses was founded upon a policy unknown in our Colonies. It was that policy which grew up in the reign of Henry VIII, of keeping up an established church and aiding it in its temporal possessions. Our Colony never imported any established church, and the doctrine of charitable uses, which was designed to support such a church, became unnecessary here.

We do not mean that our policy has been adverse to the encouragement of colleges, schools, poor houses, hospitals and other institutions for charitable purposes, but that the establishment of these and the determination of the proper objects of such institutions and of the

means of supporting and conducting them are with us wisely left to legislative enactment and control and not to individual caprice, as under the English system. Such a system, if extensively introduced here, would be prejudicial to the public interests, by accummulating large bodies of property in few hands and leading to the growth of a power beyond public control. For the experience of society has shewn that property and power cannot be divorced.

It may be considered that there are three modes in which charitable uses may exist in a state or commonwealth, as legally or equitably enforceable ;—1. By the authority of the state, using its own means and exercising its direct control through its appointed officers exclusively.—2. Partly by institutions founded by or under the exclusive control of the state, as just mentioned, and partly by institutions and foundations established by the gifts of individuals and administered according to the will of the donor, where special authority has been given by the legislature for establishing and carrying into effect the gift, either by incorporation or other enactment, with a full knowledge of the use intended and with an acknowledgment and sanction of its propriety and benefit to the community.— 3. The third condition under which charitable uses may exist is the English system, now under discussion, where they are left to be established not only upon private endowments, but for such ends and upon such methods as individual will or caprice may dictate, without the interference or regulating supervision of the legislature, and without its sanction or admission, as the *parens patriæ*, that the use intended will be beneficial to the community and consistent with the public policy.

· The second condition of charitable uses is believed to be the one most consistent with the policy and law of this State, as evidenced by the usages of our people and the general course of our legislation. It will also be found to be the soundest and most rational in principle, and most accordant with institutions based upon the will of a majority of all the members of the community as men, irrespective of property, and having an equal and common interest in the good government of the state.

It may be true that in Pennsylvania these charitable institutions, resting upon private endowments and independent of legislative supervision and control, have always largely existed, and that they

57

have been favored under the laws of that State. This fact was a potent argument in the *Girard will case*, in support of the English doctrine as in force in that State. The same fact and our early historical connection as a State with Pennsylvania have been strongly relied on by our opponents in this case, to support the recognition of the same doctrine of charitable uses here. But it should be remembered that Delaware was a well settled colony before Penn came to Pennsylvania; and that, although the two colonies were united for a time, they separated as early as 1701, and before any system or policy in relation to charitable uses had obtained in the two united colonies. And, as in many other respects, so in this, the colony of Delaware, adopted a policy in relation to public charity wholly different from that of its sister colony. If the long existence in Pennsylvania of a system of public charities in harmony with the English doctrine is an argument in favor of the doctrine as in force in that State, certainly the absence of such a system of public charities in Delaware, is an equally strong argument against the introduction of that doctrine into this State.

We have had, as yet, no judicial decision touching this question, except the *Wiltbank case*, 2 *Harring. R.* 18, which has already been brought fully before the Court. Though not a direct decision upon the question it strongly implies the absence of the English doctrine of charitable uses. For, in that case the use, viz : the education of poor children of a church, was a good use, and such as the English Court of Chancery would unhesitatingly have protected, notwithstanding the failure of a trustee from any cause whatever ; and yet our Court held that because the trustees of the charity in that case, being a religious corporation, could not, under our statutes, hold the property for such a use, the use must wholly fail. The English doctrine was, in that case, strongly urged by the counsel for the charity in order to save the use. It was argued that the great qustion was, " not who is the trustee but what is the use," that " if the use be good, the Court will enforce it and provide a trustee." Yet the Court suffered the use to fail ; and, though not so expressing itself in terms, must have considered that our Court of Chancery had not the power to execute indefinite uses of that nature.

There has been no judicial authority in our state history of more weight, on such a subject, than that of the late Chancellor Ridgely,

one of the ablest equity judges of this or of any other country; and it has always been understood as his opinion that the English doctrine of charitable uses, and particularly the doctrine of *cy pres*, never was in force in this State.

IV. I now proceed to another general position. Whether or not the Statute of 43 Elizabeth is held, in its principles, to be in force in this State, or those principles are referred to the general jurisdiction of chancery, still the power to enforce a charity, where there are no designated individuals capable of suing for their rights and having a sufficient interest to call upon the Court for their protection, is a branch of *the prerogative power of* the Crown, which by the Revolution passed to the State, but which has never been delegated to or exercised by the Court of Chancery in Delaware. It, therefore, follows that, although in England the Attorney General, representing the King, may file an information to enforce a charity where there is no one capable of taking or enforcing the gift, yet the Attorney General in Delaware has no such power; nor does the Court of Chancery represent the prerogative of the Crown as *parens patriæ*; but this prerogative has devolved upon the legislature, and can be exercised only under its authority.

The English theory is that the King, as *parens patriæ*, superintends all charities, upon the same principle on which he is the protector of infants and lunatics; and he enforces them through the Attorney General, as his officer, by an information. In all such cases, where there is no person sufficiently ascertained to call for protection under the general equity jurisdiction of the court, the Attorney General is a necessary party, and the Chancellor exercises jurisdiction as the delegate of the Crown. In some instances the charity is administered by a scheme reported by a Master; but in other cases resort is had to the King's sign manual. 1 *Sim. & Stu.* 40; *Shelf. on Mort.* 283, 427; 7 *Ves. Jr.*, 85, 86.

In this State the prerogatives of the Crown devolved upon the people; and by the Constitution the people have vested this branch of it in the legislature. It is undoubtedly, part of the legislative power of the State. *Case of Sarah Zane's will*, 17. Jurisdiction over certain subjects of this prerogative, has been expressly conferred by the legislature upon the courts; as in the case of infants and lunatics. The care of infants has been given to the

Orphans' Court, and of lunatics to the Court of Chancery; but as to the other subject of the royal prerogative, charitable uses, the jurisdiction has been vested nowhere. On the Court of Chancery, our statute confers only ordinary equity jurisdiction; and the proceeding must be by bill and answer. *Constitution of* 1792, *Art.* VI., *Sec.* 14. Judicial power alone was delegated, and no power of prerogative. Had the Court of Chancery, as such, been considered as invested with the powers exercised by the Crown as *parens patriæ*, there would have been no occasion to confer upon it by statute the charge of lunatics, nor upon the Orphans' Court the charge of infants. :

From this condition of the law of this State, as to charitable uses, it results that,in the absence of parties having an ascertainable and individual interest in a charitable use, and of any delegation of authority by the *parens patriæ* to enforce the charity for an indefinite class, there being *a trust,* whether of goods or land, it must result in favor of the next kin or heir at law, *until* the legislature, as *parens patriæ,* shall give to the court authority to carry the trust into effect as a charitable use.

V. There remains another question,which may be briefly noticed. Is this particular devise a charitable use, capable of being enforced in equity, according to the English doctrine, even supposing that to be in force in this State?

The English decisions admit that only uses of a public nature, such as are specified in the Statute of Elizabeth, or analogous to these,are enforceable as a charitable use; that a gift for *private charity*, if not enforceable upon the general principles applicable to trusts, cannot be sustained under the doctrine peculiar to charitable uses, but results for the benefit of the next of kin or heir at law. " A charitable use, ' says Lord Camden,' is a public institution for a public purpose." Objects of mere private benevolence, not extending to public interests, have been held not to be relieveable under the Statute. *James vs. Allen,* 3 *Mer.* 17 ; *Ommaney vs. Butcher,* 1 *Turn. & Russ.* 260, (11 *Eng. Ch. R.*)

I admit that if this devise in Col. Potter's will had been for the maintenance of the poor of Kent County, without the restrictions connected with the devise, the English Courts might have enforced it as a public charity, by founding an alms house or other public

institution according to some scheme of its adoption, looking to the permanent and public relief of the poor as a class. But such a scheme would defeat the expressed intent of this testator, who evidently looked to individual relief by private charity, so as to prevent the necessity, which he was careful to exclude, of throwing the persons relieved upon any public institution, such as an alms house.

VI. Our last objection to the devise in controversy is founded upon the English Statute of 9 Geo. II, c. 36, the policy of which we hold to be in force in this State. That Statute was passed to remedy the mischiefs which had resulted from the extravagant length to which the English doctrine of charitable uses, had been pressed. It prohibited gifts of lands, or money to be laid out in lands, for charitable uses, except by deed executed twelve months before the death of the donor.

It is true that the Statute of 9 Geo. II, may not, by its own force, have operated directly upon the colonies of Great Britian; nor has it been expressly re-enacted in this State. But it was a statute passed long before the Revolution, and was one of those statutes affecting the body of the common law, which, being suited to the condition of the Colony and in harmony with the habits and policy of our people, must be taken to have been adopted by them. This is unquestionably true of other English statutes, passed as late as the reign of Geo. II. As an example, our law of set-off was founded upon a Statute of Geo. II. Our act respecting religious societies, 17 Geo. II, affords strong evidence that the policy of the Act of Geo. II. was considered then in force in this State. The Act of 17 Geo. II. was an *enabling* Statute, passed to enable religious societies to take and hold lands for certain uses, religious and charitable, such as for houses of worship, burying grounds, *school houses and alms houses.* To what purpose was this enabling act, if these societies had such power previously? And if these societies had not, without the Statute, the power to take and hold lands for charitable uses, how could the power be considered to exist in other societies or persons? Is it to be supposed that a non-religious body could take land in perpetuity to establish a charity when religious societies could not, without a special enabling act, do the same thing? Was the act founded upon a previous policy of hostility

to religious societies? Or was it not rather designed to except them, so far as it went, from the operation of a previous general policy. Then followed our Act of 1787 for incorporating religious societies in this State (*Del. Dig.* 459) which contains a provision bearing to the same conclusion. By section 3 "all gifts, grants, bargains, sales and conveyances" (to such religious societies)" of and for any messuages, lands, tenements, rents and other hereditaments, corporeal or incorporeal whatsoever, and of and for any sum or sums of money, goods, chattels, stocks in any public funds, securities for money &c., to be laid out or disposed of in the purchase of any lands, tenements, rents or other hereditaments," should after the passing of that act be made by deed executed twelve months before the death of the grantor &c. The effect of this section was to prohibit devises to religious corporations, in substantially the same terms with the English Statute of 9 Geo. II. We hold this provision to be but an application, in express and definite terms, of a previously existing policy, adverse to devises in perpetuity—a policy which forbade such devises either to religious or charitable uses. The insertion of such a restrictive provision in the Act of 1787 had its use and effect in preventing the general power to take and hold lands under the incorporating clause from operating to make religious corporations an exception to the general policy. Our final position, therefore, is that by the laws of Delaware, a devise of lands, or money to be laid out in lands, in perpetuity, to either a religious society or individuals for either a religious or charitable use, is void; and that no gift of lands, or of money to be laid out in lands, can be made, either to a religious society or for their use, or for a charitable use, except in the mode allowed in the third section of the act of 1787.

The case was held under advisement until the June Term 1849, when

WOOTTEN, J., delivered the unanimous opinion of the Court, as follows:

Benjamin Potter, the testator, by his last will and testament, bearing date the 26th day of June, 1839, and by sundry codicils thereto, after disposing of and giving certain portions of his estate to his relatives and friends, devised all the balance or residue of

his estate, real, personal, and mixed, of every description, to Potter Griffith, George S. Atkins and Levin H. Adams, in trust for the support and maintenance of the poor white citizens of Kent county, " who by timely assistance might be kept from the Poor House and from becoming inmates thereof," excluding from the benefit of any part of his bounty,all such persons as might be within the walls of the Poor House; and further directing his real estate, passing under this devise,to be rented by his executors,and the net proceeds applied to and for the purposes above mentioned, " by agents to be appointed by the Orphans' Court or Levy Court of Kent county, as might be deemed most proper."

The questions presented by the case stated are whether the devise so made, in and by the 18th item of the said last will and testament and the several codicils thereto, unto and for the charitable uses, objects and purposes in manner and form set forth in the case stated, are valid and capable of being sustained and carried out in a court of chancery, according to the rules and principles of a court of equity; or whether the same are void or illegal, and not capable of being sustained and carried out in a court of chancery, according to the rules and principles of equity.

The important principles of law which are applicable to the subject matter of this suit, have been the subject of much labor and research, and have elicited a vast amount of legal learning; and much has been displayed in the argument of this cause. Therefore, although we by no means look upon this case as one free from difficulty and obscurity, yet in its adjudication we are not left entirely in the dark, without a light or beacon to guide us; but our pathway is lighted up by the opinions and decisions of some of the ablest jurists that ever adorned the Bench, as well of this country as of that from which we derived our code of laws.

Assuming the fact, which is conceded in the argument, that the testator designed by this devise to create a trust for charitable uses and purposes, and that he employed proper and suitable language to convey the legal estate to the trustees, we proceed to the consideration of the respective questions presented by the case stated and the arguments in the cause.

It can scarcely be necessary to do more than merely glance at the objections made to the validity of this devise on the ground that

there are no trustees to execute the trust. The trustees desig-
nated and appointed by the testator may, it is true, decline and re-
fuse to execute the trust; but we are at a loss to conceive on what
principle such refusal can divert the fund from the legitimate ob-
jects of the trust, and thus defeat both the will of the testator and
the charity. It is a principle too well settled to require the aid of
reasoning or argument at the present day, that a valid trust shall
never fail for want of a proper trustee. 2 *Sugd. on Powers* 174 ; 1
*Chancery Cases* 180 ; *Coke on Litt.* 190 *b.* 4. *Sec.* 4. It is a general
principle of equity that wherever may be the legal estate, if the trust
is valid, it will be protected and enforced in a court of equity. It
is also a general rule, that a legacy given in trust does not lapse by
the death of the trustee in the testator's life time, but survives for
the benefit of the *cestui que trust.* The substance of the charity re-
mains notwithstanding the death of the trustee in the testator's life-
time, though at law the legacy lapses. *Shelford on Mortmain,* (36
*Law Library*) 367. It is sufficient that the trust appears ; and if
the party creating it does not appoint a trustee to execute it a court
of equity will follow the legal estate and decree the person in whom
it is vested, a trustee to execute the trust. *Ambler's R.* 571 ; 1 *Bro.
Ch. Rep.* 81. Lord Coke says, it is a rule of equity, which admits
of no exception, that a valid trust shall not fail for want of a trustee
to execute it; but a court of equity will execute the office. *Coke
Litt.* 113 *a, note.* Trusts are often created by will without the desig-
nation of any trustee to execute them; or it may be matter of doubt
upon the terms of the will, who is the proper party. But a court
of equity will not hesitate, where doubts exist as to the party, to
declare who is the proper person to execute the trust; and, where
no trustee is designated, it will proceed to execute the trust by its
own authority. 2 *Story's Eq. Jur.* sec. 1059; 1 *Ves. Sr. R.* 475.

It is said, however, that the objection to the validity of this de-
vise is rather on account of the uncertainty of the *cestuis que trust*
than for the want of trustees ; and it is insisted that the description
of the beneficiaries is so vague and uncertain that, even if there were
a power of selection appointed, the devise must fail as a trust.

The class of persons intended to be the recipients of the testator's
bounty are described by him as the " poor of Kent County, who by
timely assistance may be kept from being carried to the Poor House
and becoming inmates thereof; " And the testator directs the distri-

bution of the fund " to be made by agents to be appointed by the Orphans' Court or Levy Court of Kent County, as may be deemed most proper."

Is this description of the beneficiaries so vague and indefinite that they cannot be selected and ascertained by the agents who were to be appointed by the Orphans' Court or Levy Court? Are they not as susceptible of ascertainment as " the poor inhabitants of Saint Leonard Shoreditch," in the case of *Atty. Gen'l vs, Clarke, Ambler's Reports*, 422? This was a bequest of the interest of £4200, of bank annuities, to " the poor inhabitants of Saint Leonard Shoreditch ;" and it was insisted by the defendants that the bequest was void for uncertainty in the description of the persons to take ; but the bequest was sustained and the fund distributed among the poor inhabitants not receiving alms. The description in this case was much more general than in the one now under consideration, but the distribution of the fund was confined to the poor of Saint Leonard Shoreditch not receiving alms ; for, without such restriction, it was said the rich as well as the poor would be benefited, which could not have been the intention of the testator.

In this case Col. Potter restricts the distribution of the fund to the poor of Kent County who by timely assistance may be prevented from becoming inmates of the Poor House; and he expressly prohibits the bestowal of any part of his bounty upon any persons not within this description, or who are inmates of the Poor House.

A bequest was made for the benefit of the poor dissenting ministers of the gospel residing and living in any of the counties of England, to be paid to the treasurer of such charitable society or fund for the time being, for that purpose, as the major part of them should direct or appoint. It appeared that there were three distinct societies of dissenters, and that collections were made for the poor ministers of each. It was held that the bequest was not void for uncertainty ; but that the fund should be distributed to and among the poor ministers of each society. *Walter vs. Childs, Ambler's R.* 524.

The beneficiaries are said to be further uncertain, because no effectual provision is made by the testator for their selection ; and in support of this objection it is argued that under the provision made by the testator the power of selection is vested nowhere ; that it does not exist solely in either of the courts named, nor in both collectively; and, therefore, it is contended, that neither can make

the appointment of the agents who were designed to be the instruments of distribution; and consequently no *cestuis que trust* can be brought into being and invested with rights to be asserted in a court of equity. If this argument is tenable, and it is true that a power vested in any one of two or more persons is not sufficient authority for the action of either, by what authority did the late Court of Common Pleas and Supreme Court of this State exercise concurrent jurisdiction? As well might it be said that the authority to take the acknowledgment of deeds no where exists, because such authority is not conferred upon one particular officer or class of officers, but is delegated to several. But if both the Orphans' Court and Levy Court should neglect or refuse to appoint such agents as the testator designated and provided for by his will, would such neglect or refusal defeat the general intention of the testator and deprive the objects of his bounty of the benefit of the charity? Or, would it not come within the province of the Court of Chancery to supply the defect thus occasioned in the mode prescribed by the testator for the execution of the trust, by creating an agency to effect the distribution of the fund in accordance with the will of the testator? The agents are the mere instruments of distribution—the hand, as it were, to parcel out the fund and carry into effect the general intention of the testator, which, being charity, will not be allowed to fail from the neglect or refusal of the trustees to execute the trust or from the neglect or refusal of the Orphans' Court or Levy Court to appoint the agents to distribute the fund. *Atty. Gen. vs. Boultbee,* 2 *Ves. Jr.* 380; *Atty. Gen. vs. Syderfen,* 1 *Vernon* 224; *S. C.* 7 *Ves.Jr.* 43; *Mills vs. Farmer,* 1 *Mer.* 55. In these cases the object of the charity and the persons to designate it were both wanting; yet the defects were supplied and the general intention of the testator, which was charity, carried into effect.

In the case now under consideration the devise is not so general; but the testator designated and described the objects of his bounty and marked out the plan by which it was to be distributed. The principle which governed the cases just referred to, therefore, applies *a fortiori* to this case; the appointment of the agents, merely, to effect the distribution of the fund in the mode and to the persons designated and described by the testator, being the defect sought to be supplied by the aid of the Court of Chancery.

The argument against validity of this devise for want of certainty

in the beneficiaries seems to be based on the assumption of the fact that personal gifts and bequests to charity are of the same character and governed by the same principles of law; whereas I apprehend there is a manifest distinction and that the principles which govern the one class of cases are wholly inapplicable to the other. Bequests to charity seem to be an exception to the general rule laid down in reference to personal or individual gifts ; and the very authority cited at the bar and mainly relied on in support of this objection to the devise fully sustains this position and illustrates the principle which marks the distinction between the two classes of bequests. In *Powell on Devises* (21 *Law Library*,) 215. *n* 7 (which is the authority just alluded to) it is said by Sir Wm. Grant, in reference to gifts void for uncertainty, that an exception should be stated, applicable to bequests to charity, with respect to which " it is now settled upon authority, which it is too late to controvert, that where a charitable purpose is expressed, however general, the bequest shall not fail on account of the uncertainty of the object, but the particular mode of the application will be directed by the King in some cases, in others by the Court of Chancery." *Morice vs. Bp. of Durham*, 9 *Ves.* 405. Here a number of authorities are cited illustrative of this principle, some of which are very similar to the case now under consideration ; as the case of a gift to the poor in general, *Atty. Gen. vs. Matthews*, 2 *Lev.* 167 ; *Atty. Gen. vs. Clarke, Amb.* 422; *Bishop of Hereford vs. Lady Twysden*, 7 *Ves.* 324; *Paice vs. Archbishop of Canterbury*, 14 *Ves. Jr.* 364 ; or, a gift to charitable uses generally, *Clifford vs. Francis, Freem. Ch. Cases*, 330 ; *Atty. Gen. vs. Herrick, Ambler* 712 ; or, a gift to such charitable uses as the testator's executor shall appoint and the testator revokes the appointment of the executor, *White vs. White* 1 *Bro. Ch. R.* 12 ; or, a gift to such charitable uses as A shall appoint and A dies in the life time of the testator, *Moggridge vs. Thackwell*, 1 *Ves. Jr.* 464 ; 3 *Bro. Ch. R.* 517 ; 7 *Ves. Jr.* 36; 13 *Ves. Jr.* 416 ; or, he neglects or refuses to appoint, *Atty. Gen vs. Boultbee*, 2 *Ves. Jr.* 380 ; or, a gift to such charitable uses as the testator himself has appointed and no such appointment can be found, *Atty Gen. vs. Syderfen*, 1 *Vernon* 224 ; *same case* 7 *Ves. Jr.* 43 *n*; or, to such charitable uses as he shall appoint and he dies without making an appointment, *Freem. Ch. Cases* 261 ; *Mills vs. Farmer* 1 *Mer.* 55 ; or, a gift to the trustees of a charity who refuse to accept, *Atty. Gen. vs. Andrews* 3 *Ves. Jr.*

633.   In these, and all such cases, though the bequest would, upon the principles which govern the construction of testamentary dispositions in favor of general objects, be void for uncertainty ; yet, the object being charity, the crown, as *parens patriæ,* or the court, will execute it. Charities are so highly favored in the law that they have always received a more liberal construction than the law will allow in gifts to individuals. 2 *Story's Eq. Jr. Sec.* 1163. If an estate is devised to such persons as the executor shall name and no executor is appointed ; or, if one being appointed, he dies in the lifetime of the testator and no other is appointed in his place, the bequest becomes a mere nullity ; yet, such a bequest, if expressed to be for a charity, would be good ; and the Court of Chancery would, in such case, assume the office of executor and effectuate the bequest. 2 *Story's Eq. Jur. Sec.* 1166 ; *Mills vs. Farmer,* 1 *Mer. R.* 55, 94 ; *Moggridge vs. Thackwell,* 7 *Ves, Jr.* 37 ; *Atty. Gen. vs. Jackson,* 11 *Ves. Jr.* 365, 367. So, if a legacy is given to trustees to distribute and they all die in the testator's life time, yet the defect will be supplied in equity. 2 *Story's Eq. Jur. Sec.* 1166 ; *Atty. Gen vs. Hickman,* 2 *Eq. Cas Ab.* 193 ; *Duke on Char. Us.* 476 ; *Moggridge vs. Thackwell,* 3 *Bro. Ch. Rep.* 517 ; *S. C.* 1 *Ves. Jr.* 464.

Another objection taken to the validity of the devise is that it creates a perpetuity, and thus renders the lands devised forever inalienable, being devised to the trustees to be by them rented and the net proceeds to be applied for the uses and purposes of the trust. As a general principle, it is true that the law prohibits such dispositions of real estate, and in general it cannot be thus tied up ; but it nevertheless in this, as in many other respects, makes charity an exception to this rule against perpetuities. *Lewis on Perpetuity,* 687 ; (52 *Law Lib.* 437.) It follows, from the nature of the purposes and objects to which the property is devoted and the character of the ownership to which it is subjected, that for all practicable purposes it will be in dead or unserviceable hands. This, it is obvious, is the characteristic of alienations to charitable uses : it is in the very nature of such dispositions to withdraw the subject of them from any kind of circulation, as a contrary course would defeat the manifest object, which is the sustentation of the charitable institutions, or the carrying out in continuity of the benevolent purposes for which they are made.

Until the Statu'e 9 Geo. II. ch: 36, little restraint was imposed upon alienations of this sort, but the apprehensions, entertained in the reign of Geo. II., that persons on their death beds might make large and improvident dispositions of their property for such purposes gave rise to this Statute, which was designed to counteract or check such dispositions ; and under the supposition that men were in but little danger of being perniciously generous at the sacrifice of their own comfort or enjoyment, when uninfluenced by the near approach of death, it was considered that this end would be sufficiently attained by preventing persons from aliening more of their lands than they chose to part with in their lifetime. *Lewis on Perpetuity,* 689. (52 *Law Lib.* 438); 3 *Peters S. C. R.* 99. In reference to the Statute 9 Geo. II., Sir William Grant said ; " In its causes, its objects, its provisions, its qualifications, and its exceptions, it was a law wholly English, calculated for purposes of local policy, complicated with establishments, and incapable, without great incongruity in the effect of being transferred, as it stands, into the code of any other country."

But it is said that our statutory law prohibits the disposition of lands in perpetuity, and that the devise in this case is void on that ground. There are but two statutes in this State which at all approximate to the subject. The one is that of 17 Geo. II, passed in 1744, entitled " An Act for the enabling religious societies of Protestants within this government to purchase lands for burying ground, churches, houses for worship, schools, &c." This Act authorizes religious societies of Protestants to purchase, take and receive, by gift, grant or otherwise, land for burying-grounds, erecting churches, houses of religious worship, schools, and alms-houses, for any estate whatsoever,and to hold the same for such uses andpurposes ; *provided,* (by the fourth section) that nothing in the act contained should be deemed, taken or construed to enable any of the said religious societies of people, or any person or persons whatsoever in trust for them or to their use, to purchase, take or receive any lands or tenements by gift, grant or otherwise, for or towards the maintenance or support of the said churches, houses of worship, schools, or alms-houses, or the people belonging to the same, or for any other use or purpose save for the uses in the Act before mentioned. It is not contended that the devise in question is rendered invalid by this Act, or in any wise affected by it; but it is insisted that any devise of land, or

of money to be laid out in land, is void except in the mode allowed by the third section of the Act of 1787 (*Digest Del. Laws.* 460,461.) This is an act designed exclusively for the protection and government of the temporal concerns of all religious societies or denominations, the first section of which provides that each and every religious society or congregation of christians, of whatever sect or denomination, may elect or choose any number of their society, not exceeding seven nor less than three,to be trustees of the same ; which said trustees and their successors in office are constituted a body politic and corporate, by whatever name they may take and assume ; and the second section provides that the said trustees, in their corporate name and capacity, shall forever thereafter be authorized in law to purchase, take, hold, receive, and enjoy any messuages, lands, tenements, rents and other hereditaments and real estate, in fee-simple or otherwise, and also goods and chattels, sum or sums of money, and personal estate whatsoever, to and for the us? of their respective societies or congregations ; provided (by the third section) that all gifts, grants, bargains, sales and conveyances of and for the same shall be made by deed, twelve calendar months, at least, next before the death of the donor, grantor or bargainor; otherwise to be void. The trustees of these religious societies are by this Act made and constituted corporate bodies, and like all other corporations are the mere creatures of the law, created and existing by it and only in the manner and for the purposes therein and thereby limited and prescribed ; and, therefore, they cannot exercise any power whatever not expressly given them, much less that which the law creating them expressly declares they shall not have or exercise. It follows, therefore, that any gift, grant, or conveyance of lands, or money to be laid out in lands, or any other gift, grant or conveyance to the trustees of any such society, not conformable to the provisions of the Act from which they derive their existence as a corporate body, would be absolutely void; and this was the ground upon which the decision of the court was based in the case of the *State vs. Bates, Adm'r of John Wiltbank dec'd. 2.Harring. R.* 18. This was the case of a devise by Wiltbank of the proceeds of the sale of real estate to the trustees of the Methodist Episcopal Church at Dover, in their corporate capacity, to be applied by them in such manner as they should devise, towards educating poor children of the members of said church. The Court in that case very properly held that the

devise was void, not on the ground, however, that a devise for charitable purposes could not be made and enforced, but because it was a devise to the trustees of a religious society, falling precisely within the prohibition of the very law which gives them existence as a corporate body, not being conformable either to the provisions of the Act of 1787 or of 17 Geo. II, in 1744, but in direct derogation of both.

The case now under consideration is of a different character ; and altogether unlike that of a devise to trustees of a religious society. It cannot be classed among the mischiefs intended to be guarded against by our Statute ; nor does it fall within their prohibtion.

In the view which we have taken of this case it is one of a valid trust for charitable uses and purposes, with trustee appointed by the testator to execute it, with the aid of agents, to be appointed, to select the objects of the testator's bounty in a mode sufficiently indicated by the testator, and which is not prohibited or rendered invalid by any statute of this State.

The remaining and perhaps the most important question, next to be considered, is," whether the devise is capable of being sustained and carried out in a court of chancery, according to the rules and principles of equity."

This objection leads to the inquiry whether the Court of Chancery, prior to and independent of the Statute 43 Elizabeth, had jurisdiction to enforce charitable uses, or whether its jurisdiction was derived solely from that Statute. We find no evidence on the face of the Statute itself that such jurisdiction was conferred by it. It contains no provision from which such a conclusion can be drawn, either directly or inferentially, except in case of appeal from the commissioners. The Statute itself, then, affording no evidence as to the source from whence this jurisdiction was derived we are obliged to seek other information ; and we know of none so likely to lead us to proper and correct conclusions as adjudged cases by learned and able jurists, whose opinions have been formed upon a thorough investigation of the subject and are the result of much labor and research. In the case of *Eyre vs. the Countess of Shaftsbury*, 2 *P. Wms.* 119, Sir Joseph Jekyll said " in the case of charity the King, *pro bono publico*, has an original right to superintend the care thereof, so that, abstracted from the Statute of Elizabeth relating to charitable uses,

and antecedent to it, as well as since, it has been every day's practice to file informations in chancery, in the Attorney General's name for the establishment of charities. 2 *Equity Cas. Ab.* 710. And Lord Northington in the case of *Atty. Gen. vs. Tancred,* 1 *Eden R.* 10 ; *same case in Amb. R.* 351 ; 1 *Wm. Blk. R.* 90; and Lord Chief Justice Wilmot in the case of *Atty. Gen. vs. Lady Downing,* both held the same doctrine. Lord Redesdale, who was confessedly a very learned and able chancery lawyer, in the case of the *Atty. Gen. vs. the Mayor of Dublin,* 1 *Bligh's R.* 347, says, in reference to the Statute 43 Elizabeth, " the Statute only created a new jurisdiction, a jurisdiction created by commission, but the proceedings of the commissioners were made subject to appeal to the Lord Chancellor, and he might reverse or affirm what they had done, or make such order as he might think fit for preserving the controlling jurisdiction of the Court of Chancery as it existed before the passing of that Statute; and there was no doubt," he said, "but the same thing could be done *by information by the Attorney General in the exercise of his right of prerogative* ; that the King, as *parens patriæ,* has the right, through his proper officers, to call upon the several courts of justice, according to their respective jurisdictions, to see that right is done to his subjects who are incapable to act for themselves as in the case of *charities* and other cases." It appears, therefore, that Lord Redesdale repudiates the doctrine that the jurisdiction of the Court of Chancery over charitable uses was derived from the Statute 43 Elizabeth; and he maintains it in the fullest and broadest terms as being the inherent jurisdiction of chancery independently of and antecedent to the Statute of Elizabeth. In the case of *Atty. Gen. vs. Middleton,* 2 *Ves. Sr.* 327 (so far back as 1751), Lord Chancellor Hardwicke said that information in the name of the Attorney General as an officer of the crown was not a head of the Statute of charitable uses, because original jurisdiction was exercised in that court before ; but that was always in cases now provided for by that Statute, that is, charities at large. So in the case of *Atty. Gen. vs. Matthews,* 2 *Levinz* 167, it was held that general charities were not within the power of the commissioners under the Statute 43 Elizabeth. "This being a general charity, and for the poor in general," says Lord Keeper Finch, " the commissioners have nothing to do with it, but it is to be determined by the Court of Chancery on information by the Attorney General in behalf of the King " And, in the case

of *The Incorporated Company vs. Richards*,1 *Drury & Warren's R.* 258, Lord Chancellor Sugden, in a very able and elaborate opinion upon the very point now under consideration, declared that in equity there is inherent jurisdiction over cases of charity; and that it is one of the objects for which a court of equity has at all times interfered to make good that which at common law was void.   In the case of *Sarah Zane's will*, in the Circuit Court of the U. S., at the April Term 1833, Judge Baldwin, after a very laborious research into the English statutes and authorities, arrived at the same conclusion; and, in a very able and lucid opinion, maintained the doctrine of inherent jurisdiction independently of and antecedent to the Statute 43 Elizabeth,in which opinion Judge Hopkinson entirely concurred, Here is a current of authorities, sustained by the opinions and *dicta* of very eminent Judges, establishing the doctrine that, independently of and prior to the Statute 43 Elizabeth, the Court of Chancery could enforce charitable uses under its general jurisdiction, and that such jurisdiction had been exercised both subsequent and antecedent to that Statute.   The defendants, however, maintain the contrary doctrine ; 'and,in support of their position, they rely mainly upon the case of *The Baptist Association, vs. Hart's Executors,* 4 *Wheaton* 1, and the authorities there cited in support of the objection to the validity of the devise in that case.   It is, doubtless, true that the opinion of the court in the case of *The Baptist Association vs. Hart's Ex'rs*, was delivered by a judge who stands deservedly pre-eminent in his profession, equalled by few and perhaps surpassed by none of his day in this country, and whose opinions are entitled to great respect.   But, since that opinion was announced by Chief Justice Marshall, the same Court, so recently as the January Term 1844, decided the case of *Vidal et. al vs. the Mayor, Aldermen and Citizens of the city of Philadelphia,* in which they overrule and abandon the principles upon which the decision in *The Baptist Association case* was based; and they take the ground that antecedent to and independently of the Statute 43 Elizabeth the Court of Chancery had jurisdiction over charitable uses.   Mr. Justice Story, in delivering the opinion of the Court in the case just referred to, after reviewing all the authorities, including the case of *The Baptist Association vs. Hart's Ex'rs*,which he said was strongly relied on as fully in point, says, " but very strong additional light has been thrown upon this subject by the recent publications of the com-

missioners on the public records in England which contain a very curious and interesting collection of the chancery records in the reign of Queen Elizabeth, and in the earlier reigns. Among these are found many cases in which the Court of Chancery entertained jurisdiction over charities long before the Statute 43 Elizabeth ; and some fifty of these cases, extracted from the printed calendars, have been laid before us. They establish, in the most satisfactory and conclusive manner, that cases of charities, where there were trustees appointed for general and indefinite charities, as well as for specific charities, were familiarly known to and acted upon, and enforced in the Court of Chancery. In some of these cases the charities were not only of an uncertain and indefinite nature, but, as far as we can gather from the imperfect statement in the printed records, they were also cases where there were either no trustees appointed or the trustees were not competent to take. These records, therefore, do, in a remarkable manner, confirm the opinion of Sir Joseph Jekyll, Lord Northington, Lord Chief Justice Wilmot, Lord Redesdale and Lord Chancellor Sugden. Whatever doubt, therefore, might properly be entertained upon the subject when the case of *The Baptist Association vs. Hart's Ex'rs,* was before this Court in 1819, these doubts were entirely removed by the later and more satisfactory sources of information to which we have alluded."

*The Baptist Association case,* and those of Virginia and Maryland which were evidently decided on its authority, and of course must fall with it, being thus stricken, as it were, from the catalogue of judicial decisions, the question rests on the authority of adjudged cases in several of the different States, affirmed by the United States Court in the case of *Vidal vs. the Mayor, Aldermen, and Citizens of Philadelphia,* just referred to, all going to establish most conclusively an inherent jurisdiction in the Court of Chancery anterior to, and independent of, the Statute of 43 Elizabeth.

If the Court of Chancery in England is clothed with this jurisdiction, the same jurisdiction belongs to the Court of Chancery of the State of Delaware. Equity jurisdiction in this State was originally vested in the Court of Common Pleas, and the Justices of that Court were clothed with the powers of the High Court of Chancery of Great Britain and required to observe the rules and practice of that Court in the exercise of the jurisdiction thus conferred upon

them. 1 *Del. Laws,* 130, 131. And, by the Constitution of 1792 of the State of Delaware, the equity jurisdiction theretofore exercised by the Court of Common Pleas, was separated from the common law jurisdiction and vested in a Chancellor, who should hold a Court of Chancery in the several counties of the State. *Art. VI, Sec. 14 of Constitution of* 1792.

Under the view which we have taken of the respective branches of this case, it is the opinion of the Court that the decree of the Chancellor ought to be, and it accordingly is, hereby, affirmed.